**Sante KIMES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 86–1267.**

District of Columbia Court of Appeals.

Argued Jan. 26, 1989.
Decided Oct. 31, 1989.

Andrew L. Frey, Washington, D.C., for appellant. Joseph Peter Drennan, Michael H. Metzger, and David B. Smith, Washington, D.C., also filed briefs on behalf of appellant.

Sharon A. Sprague, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, were on the brief, for appellee.

Before MACK,[*] FERREN, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of grand larceny, D.C.Code § 22–2201 (1981), for theft of a full-length mink coat from the Town and Country Lounge at the Mayflower Hotel. Appellant (through counsel who were not trial counsel) raises five issues on appeal. She questions the admissibility of alleged "other crimes" evidence, a trial court instruction on the propriety of joint pretrial discussions among government witnesses, and the denial of a requested continuance. She also claims errors requiring a remand for resentencing. The most significant claim of error, however, is appellant's other contention: that the trial court, by proceeding to verdict in appellant's absence, violated her right under the Constitution and local statutes to be present at every stage of the trial.

Because the trial court failed to make any factual finding as to the voluntariness—or involuntariness—of appellant's absence, we are unable to decide this claim of error. Accordingly, we remand the record to the trial court for an evidentiary hearing on the circumstances surrounding appellant's absence during the return of the verdict and a finding as to whether her absence was voluntary or involuntary. In all other respects we affirm the conviction.

## I.

### A.

Appellant had been present throughout her trial, but on July 18, 1985, although in

---

[*] *Judge* MACK was an *Associate Judge* of the Court at the time of argument. She became an *Associate Judge, Retired,* on Oct. 1, 1989.

court when the trial resumed at 10:00 a.m., she failed to appear after a luncheon recess. At 11:20 a.m. the jury had begun deliberations. At 12:17 p.m. the trial judge had excused the jury for lunch until 1:20 p.m. The judge also had excused counsel and appellant, specifically cautioning appellant "to be available in the vicinity of the courtroom from and after 1:30."

Sometime after the lunchbreak, the court reconvened counsel to inform them about two notes the jury had sent. Appellant was not present. The court noted her absence, and counsel waived her presence for the purpose of accepting the notes. The first note, received at 2:37 p.m., said, "We have reach[ed] a verdict." The second, sent only four minutes later, said, "Please disregard the last note." Counsel told the court that he had looked for appellant for three or four minutes but had not seen her since before lunch. Aware that appellant's counsel was in trial in another courtroom, the judge asked him if anyone else could assist in locating appellant to inform her that she should be available. After appellant's counsel replied he would call his office to see whether someone could help, counsel were excused.

At about 3:55 p.m., the jury sent its final note announcing it had reached a verdict. The trial judge then recalled the case to take the verdict.[1] Appellant was still absent. Her counsel reported that when he had left the courtroom previously, he had looked for appellant in the general area for five to ten minutes and that he believed his assistant had probably continued to look for her during the next hour. Counsel asked the court to delay receiving the verdict at least until the following day so that he could try to ascertain appellant's whereabouts and assure her presence. The trial judge replied that several jurors had already completed their terms of service and proceeded to call in the jury, which delivered the verdict. After dismissing the jurors, the trial court issued a bench warrant for appellant's arrest.

The record reveals some information about the circumstances surrounding appellant's absence at the verdict. Medical reports attached to appellant's application for review and modification of conditions of release pending sentencing, filed in late September 1985, indicate that on July 18, 1985, at the time the verdict was rendered, appellant was hospitalized after being struck by a car in Arlington, Virginia, at approximately 1:45 p.m. According to these reports, appellant remained in the hospital until 8:30 that evening when she left against medical advice. The record also indicates that on July 21, three days after the verdict, appellant sent a telegram from her home in California to her trial counsel, with a copy to the court, describing the accident and her injuries and asking for information on the status of her case. (Aside from this telegram, the record reveals no other attempt by appellant to communicate the reason for her absence to the court or to counsel.) On August 3, 1985, appellant was arrested in La Jolla, California on the bench warrant and on unrelated federal charges.

### B.

■ "The defendant shall be present at ... every stage of the trial including ... the return of the verdict," unless he or she "[v]oluntarily absents himself [or herself]." Super.Ct.Crim.R. 43(a), (b)(1); *see Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 253, 56 L.Ed. 500 (1912); *Black v. United States*, 529 A.2d 323, 323 (D.C. 1987). This Rule 43 requirement, like the comparable federal rule requirement, is rooted in the confrontation clause of the sixth amendment, *United States v. Gordon*, 264 U.S.App.D.C. 334, 338, 829 F.2d 119, 123 (1987), but is premised on "the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him [or her]." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (per curiam). Rule 43 also embraces the "common law right of presence." *United States v. Washington,*

---

1. In the interim, the jury had sent out a note asking for a coffee break, and at 3:38 the court authorized a recess. Defense counsel was not present at this time, nor was appellant.

227 U.S.App.D.C. 184, 191, 705 F.2d 489, 496 (1983) (citing *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)).[2] The " 'protective scope' " of Rule 43, therefore, "is broader than the constitutional right alone." *Gordon*, 264 U.S.App.D.C. at 338, 829 F.2d at 123 (citing *Washington*, 227 U.S.App.D.C. at 192–93 n. 5, 705 F.2d at 497–98 n. 5).[3]

According to the Supreme Court, a constitutional right is implicated whenever a criminal defendant's presence at trial or trial-related proceedings " 'has a relation, reasonably substantial, to the fullness of his [or her] opportunity to defend against the charge.' " *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987) (quoting *Snyder*, 291 U.S. at 105–06, 54 S.Ct. at 332). Although this right of presence is not constitutionally guaranteed " 'when presence would be useless or, the benefit but a shadow,' . . . due process clearly guarantees that the defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his [or her] absence.' " *Id.* (quoting *Snyder*, 291 U.S. at 106–07, 108, 54 S.Ct. at 332–33). In sum, a defendant is constitutionally "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his [or her] presence would contribute to the fairness of the procedure." *Id.*

■ The requirement of a defendant's presence at trial, whether derived from the Constitution or otherwise, can be deemed waived in the defendant's absence if the trial court determines that the defendant voluntarily failed to appear at trial. *See* Super.Ct.Crim.R. 43(b)(1) (waiver of right to be present whenever defendant, initially present, "voluntarily absents himself [or

herself] after the trial has commenced . . ."). Rule 43(b)(1) reflects the teaching of *Taylor v. United States*, 414 U.S. 17, 18–20, 94 S.Ct. 194, 195–96, 38 L.Ed.2d 174 (1973), in which the Supreme Court, upholding a "longstanding rule" set forth in *Diaz*, stated that a defendant out on bail in a non-capital case who voluntarily fails to appear at a trial at which the defendant was initially present has waived his or her right to be present. In *Taylor*, the Court quoted the test for voluntariness articulated in *Cureton v. United States*, 130 U.S.App.D.C. 22, 27, 396 F.2d 671, 676 (1968), as "the controlling rule":

> [I]f a defendant at liberty remains away during his [or her] trial the court may proceed provided it is clearly established that his [or her] absence is voluntary. He [or she] must be aware of the processes taking place, of his [or her] right and of his [or her] obligation to be present, and he [or she] must have no sound reason for remaining away.

*Taylor*, 414 U.S. at 19 n. 3, 94 S.Ct. at 196 n. 3. According to the Court, it is "wholly incredible" to suggest that a defendant at liberty on bail who attended an opening opinion of trial, and who had a duty to be present at trial, *see Stack v. Boyle*, 342 U.S. 1, 4–5, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951), would not know of his or her right to be present at every stage of trial or that trial would continue in the defendant's absence. *Taylor*, 414 U.S. at 20, 94 S.Ct. at 196.[4]

■ It follows that before proceeding with trial in the absence of a defendant, trial courts, in accordance with local or federal rules similar to Super.Ct.Crim.R. 43(b)(1), are required to make findings concerning voluntariness of the defendant's absence. *See United States v. Hernandez*,

---

**2.** *See also Boone v. United States*, 483 A.2d 1135, 1139 (D.C.1984) (en banc) (Rule 43(a) " 'incorporates the protections afforded by the Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common law right of presence' ") (quoting *Welch v. United States*, 466 A.2d 829, 838 (D.C.1983)).

**3.** *See also Black*, 529 A.2d at 324 (in assessing violations of right of presence, court distinguishes between cases where constitutional rights are, and are not, involved).

**4.** When the trial court has made a preliminary finding that the defendant was absent from trial, the defendant must come forward with evidence to rebut that finding. *See Brown*, 399 A.2d at 1225. The government, however, has the burden of establishing ultimately that the defendant has waived the right to be present at trial. *Id.*

842 F.2d 82, 85 (5th Cir.1988); *Cureton*, 130 U.S.App.D.C. at 24, 396 F.2d at 673; *Charliaga v. State*, 758 P.2d 135, 136 (Alaska Ct.App.1988); *People v. Connolly*, 36 Cal.App.3d 379, 382, 111 Cal.Rptr. 409, 411 (1973).[5] However, the crucial question —"Why is the defendant absent?"—"rarely can be answered at the time the court must determine whether the trial should proceed." *People v. Connolly*, 36 Cal.App.3d at 385, 111 Cal.Rptr. at 412. Accordingly, trial courts customarily delay the proceedings to enable counsel and the court's marshals to attempt to locate a missing defendant, *see, e.g., Cureton*, 130 U.S.App.D.C. at 24, 396 F.2d at 673; *State v. Staples*, 354 A.2d 771, 774 (Me.1976), and appellate courts encourage such delay, *see, e.g., Connolly*, 36 Cal.App.3d at 385, 111 Cal.Rptr. at 413; *Gilbert v. State*, 182 Ind.App. 286, 395 N.E.2d 429, 432 (1979); *Commonwealth v. Kane*, 19 Mass.App.Ct. 129, 134, 472 N.E.2d 1343, 1347 (1984). Reviewing courts also urge trial courts, when the defendant ultimately appears, to inquire and make findings and conclusions concerning the circumstances of the absence from trial. *See United States v. Hernandez*, 873 F.2d 516, 519 (2d Cir.1989) (when appellant's counsel registered objection to proceeding in appellant's absence and appellant later appeared, "it was incumbent upon the trial court to conduct the requisite inquiry into the circumstances of his absence"); *United States v. Muzevsky*, 760 F.2d 83 (4th Cir.1985) (if court after preliminary inquiry chooses to proceed with trial, it should withhold decision on motion for new trial and sentencing until it can learn whether defendant voluntarily waived right of presence); *Staples*, 354 A.2d at 776 (due process requires trial court to "afford[ ] the defendant an adequate opportunity to explain [the] absence when he [or she] is

returned to custody and before sentence is imposed").

The United States Court of Appeals for the District of Columbia Circuit has stressed, moreover, that the trial court's duty of inquiry extends throughout the period up to sentencing. It suggested in *Cureton* that the trial court at sentencing should "explore the reason the defendant was absent" so as to develop a record basis for determining whether the trial was properly continued in the defendant's absence, 130 U.S.App.D.C. at 27, 396 F.2d at 676. Later, in *Gaither v. United States*, 134 U.S.App.D.C. 154, 174, 413 F.2d 1061, 1081 (1969), the same court stated that "where some question of involuntary absence arises at sentencing, a record and a determination can and should be made at that point."

In short, even though a trial court may not be able to learn until after trial why a defendant failed to appear, the court will be deemed to have erred in permitting the trial to continue—call it a retroactive, imputed error—if under the circumstances the defendant cannot be said to have voluntarily waived the right to be present.

■ Furthermore, even though a defendant has voluntarily waived the right to be present at trial[6]—whether a constitutional right to be present is at issue or not—there is still the question whether the trial court has abused its discretion in ordering a trial *in absentia*. *See United States v. Sanchez*, 790 F.2d 245, 250–51 (2d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 587 (1986). That question is resolved by considering such factors as the reasonableness of the trial court's efforts to ascertain the defendant's whereabouts, the likelihood that the trial could occur with the defendant present, the burden on the government, witnesses, and jurors if

---

5. Some courts have found in the due process clause the requirement for on-the-record factual findings before proceeding with trial in the absence of a defendant. *See State v. Staples*, 354 A.2d 771, 776 (Me.1976); *State v. Brown*, 121 R.I. 422, 399 A.2d 1222, 1225 (1979).

6. The trial court's determination of voluntariness is itself a mixed question of fact and law. *See Finney v. Rothgerber*, 751 F.2d 858, 862 (6th

Cir.1985). We defer to the trial court's determination of the underlying facts unless clearly erroneous, *see Auxier v. Kraisel*, 466 A.2d 416, 418 (D.C.1983) (interpreting D.C.Code § 17–305(a) (1981)), and review the ultimate determination as to voluntariness de novo as a matter of law, *see United States v. Felder*, 548 A.2d 57, 61–62 (D.C.1988).

the trial were delayed, and the appellant's interest in being present at the trial proceedings that remained. *See Hernandez,* 842 F.2d at 85; *Sanchez,* 790 F.2d at 250–51.

■ When, however, a defendant's absence is involuntary, but the trial court proceeds through trial and sentencing on the basis of an incorrect finding of voluntariness, and no constitutional right—only a statutory or rule violation—is at issue, then we will reverse if there is a reasonable possibility of prejudice from defendant's absence. *See United States v. Brown,* 571 F.2d 980, 986–87 (6th Cir.1978); *see also United States v. Alessandrello,* 637 F.2d 131, 139 (3d Cir.1980), *cert. denied,* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981) (considering only Rule 43, not constitutional, violation); *Wade v. United States,* 142 U.S.App.D.C. 356, 360–61, 441 F.2d 1046, 1050–51 (1971) (same). But, when a defendant's absence was involuntary and the constitutional right to be present is at issue, this court will reverse unless the government proves the defendant's absence was harmless beyond a reasonable doubt. *See Kleinbart v. United States,* 553 A.2d 1236, 1240 (D.C.1989); *see also Bustamante v. Cardwell,* 497 F.2d 556, 558 (9th Cir.1974); *State v. Okumura,* 58 Haw. 425, 430, 570 P.2d 848, 853 (1977); *State v. Rice,* 110 Wash.2d 577, 617, 757 P.2d 889, 911 (Wash.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 3200, 105 L.Ed.2d 707 (1989). *But see Lee v. State,* 244 Ala. 401, 403, 13 So.2d 590, 593 (1943) (defendant's absence at verdict automatically reversible error); *Shaw v. State,* 282 A.2d 608, 610 (Del.Super.Ct.1971) (same).

### C.

■ Our analysis on review accordingly must depend, first, on whether appellant's absence at the time of the verdict was voluntary or involuntary and, second, on whether that absence implicated a constitutional right. The trial court has not made either determination. Although the trial court, in proceeding to verdict, presumably inferred that appellant was absent voluntarily, the trial court erred in failing to conduct an on-the-record inquiry into the circumstances surrounding appellant's absence and to make findings and conclusions concerning whether the absence was voluntary. The trial court also erred in not pursuing this issue further at sentencing. Counsel for appellant had objected at trial to proceeding to verdict when appellant was not present, and thus the trial court was clearly on notice of an expressed concern. Moreover, there was ample evidence in the record before sentencing—notably appellant's application for review and modification of conditions of release pending sentencing—which set forth factual allegations concerning the auto accident that indicated appellant's absence may have been involuntary.[7] Accordingly, because the trial court failed to conduct, either at trial or at sentencing, any inquiry into the circumstances surrounding appellant's absence from trial, we must remand the record for the necessary finding as to voluntariness. *See Black v. United States,* 506 A.2d 1130, 1132 (D.C.1986).

■ We turn to the next issue: whether appellant's absence at the verdict implicated a constitutional right. This is purely a question of law which this court can properly decide in the first instance. We conclude that the right to "be present ... at the return of the verdict," Super.Ct. Crim.R. 43(a), is a right of due process under the fifth amendment. *See People v. Nelson,* 18 Ill.2d 313, 319, 164 N.E.2d 16, 20 (1960); *Rice,* 110 Wash.2d at 617, 757 P.2d at 911; *see also Okumura,* 58 Haw. at 425, 430, 570 P.2d at 850, 853 (referring to "constitutional right to be present"). This right to be present at the verdict "has

---

**7.** Because our dissenting colleague points to the fact that appellant departed from the hospital against medical advice and proceeded directly to California as evidence of the voluntariness of her absence from the verdict, we believe it appropriate to note that Judge Bacon herself found in her order of October 4, 1984, denying appellant's application for review and reconsideration of conditions of release pending sentencing that defendant's departure in this manner was "evidence which suggests that defendant may have a mental instability which impairs compliance with court orders."

a relation, reasonably substantial, to the fulness of [appellant's] opportunity to defend against the charge," and thus "a fair and just hearing would be thwarted by [her] absence." *Snyder,* 291 U.S. at 105–06, 106–07, 54 S.Ct. at 332–33. As the Supreme Court of Pennsylvania stated in *Commonwealth v. Ashe,* 363 Pa. 596, 601, 603, 70 A.2d 625, 628, 629 (1950) (quoting *Temple v. Commonwealth,* 77 Ky. (14 Bush) 769, 771 (1879)), noting the concurrence of all 36 States that had ruled on the issue:

> "The presence of the accused [at the verdict] is not a mere form. It is of the very essence of a criminal trial not only that the accused shall be brought face to face with the witnesses against him [or her], but also with his [or her] triers. * * * And at no time in the whole course of the trial is this right more valuable than at the final step when the jury are to pronounce that decision which is to restore him [or her] to the liberty of a citizen, or to consign him [or her] to the scaffold or to a felon's cell in the state prison."

When a jury returns to the courtroom, faces the accused, and, typically, is subject to a poll of the verdict, the psychological influence of the eye-to-eye contact between juror and defendant may be significant enough to cause a juror to change his or her mind when outside the pressure of the jury room. *See Wade,* 142 U.S.App.D.C. at 360, 441 F.2d at 1050; *Lee v. State,* 509 P.2d 1088, 1094 ("The psychological distinction between a general poll in [defendant's] absence, and an individual poll requiring each juror to assume the burden of his [or her] decision and affirm it in the defendant's presence is not a minor one."); Golden, *Presence of the Defendant at Rendition of the Verdict in Felony Cases,* 16

COLUM.L.REV. 18, 22–23 (1916). *See also United States v. Fontanez,* 878 F.2d 33, 38 (2d Cir.1989) (trial court committed reversible error, depriving defendant of "psychological function" of his presence on jury, when it instructed deadlocked jury in his absence). A defendant's absence could cause adverse speculation, *see Wade,* 142 U.S.App.D.C. at 360, 441 F.2d at 1050, thereby neutralizing a tentative juror's reluctance to acknowledge a guilty verdict in open court. Moreover, the appearance of justice is affected by the announcement of a guilty verdict when the defendant is not present to hear it. *See Heiligh v. United States,* 379 A.2d 689, 693 n. 7 (D.C.1977) (identifying one reason underlying sixth amendment right to be present as preventing "the loss of confidence in courts as instruments of justice which secret trials would engender" (quoting *United States v. Gregorio,* 497 F.2d 1253, 1258 (4th Cir.), *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974))).

The remand suggests several possible results. If, on remand, the trial court determines that appellant's absence from trial at the time of return of the verdict was voluntary, and if this court, after reviewing that determination, agrees with the trial court, we will then review the court's decision to proceed with trial only for an abuse of discretion. If, however, the trial court determines, on remand, that appellant's absence was involuntary—or the trial court determines the absence was voluntary but this court, after review, concludes as a matter of law that the absence was involuntary, *see supra* note 6—we presumably will reverse and remand for a new trial unless we can say the court's imputed error in receiving the verdict in appellant's absence was harmless beyond a reasonable doubt.[8]

---

**8.** We say we "presumably" will apply a harmless error analysis because that is the reviewing court's traditional approach and we have done so on occasion in comparable circumstances. *See Kleinbart,* 553 A.2d at 1240 (trial court error in refusing to permit defendant to be present at bench conference was not harmless beyond reasonable doubt). On the other hand, in at least one instance we appear to have concluded there was reversible error *per se* when the trial court

found, after a remand, that the defendant's absence from trial during the testimony of witnesses had been involuntary. *See Black,* 529 A.2d at 324–25. Interestingly, if we were to remand the case, not the record, and the trial court were to find appellant's absence had been involuntary, then presumably the trial court would order a new trial—as it would have done if the trial court had made a post-trial finding to that effect without this court's involvement.

## II.

Appellant raises four other issues on appeal, none of which has merit. First, appellant argues that her conviction must be reversed because the trial court erred in admitting into evidence two coats which the police seized from her hotel room shortly after the theft of the fur. The government's evidence indicates that appellant stole a dark fur coat from the Mayflower Hotel's Town and Country Lounge on the night of February 4, 1980. Appellant, who was staying at the Mayflower, put on the fur, which had been thrown over some chairs in the lounge, and then slipped her own full-length white fur coat over it before departing. Two witnesses directly observed the theft and later reported the incident to police detectives with the assistance of others in the bar who had-seen appellant. After conferring with hotel personnel, the detectives suspected that appellant was the thief and proceeded to her seventh floor room. After noting that appellant matched the descriptions they had received from the witnesses, and after receiving permission from appellant to conduct a search of appellant's room, the police located not the stolen fur but two other coats that were missing their labels.[9] Two days later, the police returned to the room with a warrant and seized a third coat which also had no label. Before trial, appellant filed a motion in limine seeking to exclude the admission of two of the coats without labels. The trial court denied the motion.

Appellant argues on appeal that the "other coats" evidence was improperly admitted

*Drew* evidence, *see United States v. Drew,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), which "substantially swayed" the judgment of the jury, *see Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248 90 L.Ed. 1557 (1945). She contends that, although the trial court admitted "other coats" evidence for its probative value in establishing the identity of the thief, the jury could not help inferring from the missing labels that appellant stole the other coats and, therefore, must also have stolen the fur at issue in this case. According to appellant, given the likelihood that the jury would conclude from the "other coats" evidence that appellant possessed a propensity to steal coats, the trial court should have determined whether the "other coats" evidence met the strict test for admitting "other crimes" evidence for identification purposes under *Drew. See, e.g., Bridges v. United States,* 381 A.2d 1073 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). Although we agree that the admission of the "other coats" evidence raised the possibility of the unfavorable inference that appellant suggests, we conclude that, under the circumstances, admission of this evidence does not warrant reversal of appellant's conviction.

The record indicates that, before trial, defense counsel waived any claim of prejudice from admission of the "other coats" evidence, provided the government adhered to stipulated ground rules. In support of appellant's motion in limine to exclude the "other coats" evidence, counsel had argued that the coats were not probative evidence and expressed concern that their admission

---

That possible result, therefore, suggests an interesting question: if the trial court were to find appellant's absence had been involuntary, would there be any sound basis for concluding that a harmless error analysis should be applied (instead of automatic reversal) simply because we have retained the case by remanding the record? Assume next, for the sake of argument, that the answer is "no"—that a trial court finding of involuntary absence would automatically warrant a new trial whether we had remanded the case or the record. Assume, further, that the trial court made a finding that appellant's absence had been voluntary but that this court *rejected* that finding as a matter of law. Would there be a justification for harmless error analysis instead of automatic reversal? *See generally*

*Davis v. United States,* 564 A.2d 31 (D.C.1989) (en banc). Because we do not know how the trial court will rule on the voluntariness issue, we need not consider these questions.

**9.** One of the detectives also noticed that the bedroom window of the hotel room had been forced open. He observed, several stories below, something that looked like a coat; it was later identified by the owner of the stolen fur as the lining of her missing coat. The stolen fur coat itself was located about two weeks later, without its lining, balled up behind an ice machine near an elevator on the seventh floor where appellant had been staying.

might prejudice appellant because the jury might infer from the missing labels that the coats were stolen. Government counsel responded that the "other coats" evidence was relevant to the issue of the identity of the coat thief because it is unusual for a person to possess labelless items and the stolen coat, like the other coats, was found without its label. Appellant's counsel then stated that he would not object to the admission of the "other coats" evidence if the government would stipulate there was no evidence that the coats were stolen and the court would so instruct the jury. The government agreed to such a stipulation, and the court denied appellant's motion in limine, offering to provide any instruction necessary to avoid jury confusion during trial. Later, in response to an objection and then sua sponte, the trial judge twice instructed the jury during the government's case that there was no evidence the other coats were stolen. The court also instructed the jury before its deliberations that the "other coats" evidence was admitted solely to prove the identity of the perpetrator.

Counsel on appeal argues that the government violated its agreement not to examine witnesses in a manner that suggested the other coats were stolen; that trial counsel, although objecting on occasion to the government's conduct, was "napping" on other occasions when objection should have been made; that the prosecutor improperly used closing and rebuttal arguments to suggest the other coats were stolen; that the trial court's jury instructions on the issue were inadequate; and that the trial court recognized that, despite the pretrial stipulation in response to appellant's motion in limine, appellant had preserved her objection to admission of the other coats into evidence.

We believe the record clearly shows that defense counsel agreed to admission of the "other coats" evidence on terms which the trial court administered with several cautionary instructions, both upon objection and sua sponte. Appellant, therefore, can complain only about those isolated instances, including the government's closing arguments, where the trial court allegedly failed to enforce the parties' stipulation sua sponte. Accordingly, we review for plain error.

In doing so, we need not address the merits of appellant's contention that the other coats were, in fact, inadmissible *Drew* evidence. We conclude that even if the evidence was erroneously admitted or interpreted to the jury, any such error—in light of the strong evidence of guilt—was not "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc). The evidence implicating appellant in the crime included testimony by two eyewitnesses who saw appellant take the fur, as well as the following circumstantial evidence: indication of a forced-open window in appellant's hotel room, discovery of the stolen fur's lining directly beneath the window, and discovery of the fur itself behind an ice machine on appellant's floor. *Supra* note 9. Under these circumstances, the trial court's alleged failure to enforce the parties' agreed use of the "other coats" evidence was not plain error.

### III.

■ Appellant also maintains that the trial court committed prejudicial error when it twice instructed the jury that it was "entirely proper" for the government to hold pretrial witness conferences at which the witnesses jointly discussed their testimony. She claims that, because there were differing accounts by government and defense witnesses concerning the events at the Town and Country Lounge, impeaching the credibility of the government's witnesses was crucial to her case. According to appellant, however, the trial judge severely undermined her ability to attack the testimony of government witnesses when the court interrupted her cross-examination of a crucial government witness and issued a final instruction on its own initiative informing the jury not to draw any inference of impropriety from the fact that the government witnesses had collectively discussed the facts before trial.

We perceive no error in the trial court's instructions. Although appellant claims that she sought only to impugn the credibility of the government witnesses, during cross-examination her counsel specifically asked a witness if she knew that it would "not be proper" for "witnesses to get together and discuss their testimony." The trial court's instruction at this point was important to correct counsel's inaccurate suggestion that such conferences were improper. During closing argument, defense counsel argued, without objection or interference, that the government's witness conferences cast doubt on the credibility of its witnesses. While the trial court's final instruction to the jury perhaps was unnecessary to correct appellant's counsel's earlier mischaracterization, it was not erroneous, particularly in light of the standard credibility instruction issued shortly before it.

## IV.

■ Appellant contends the trial court abused its discretion in refusing to grant her pretrial motion for a continuance (and a subsequent motion for a mistrial) in order to secure the presence of defense witness Lloyd Zachery at trial.[10] Zachery had been served with a subpoena ordering his appearance at trial on July 11. On July 10, appellant's counsel received a Federal Express package from Zachery which included the subpoena, an airline ticket, a voided check for witness fees, and travel information that counsel had mailed him. In an accompanying note, Zachery stated that "sudden urgent business commitments will prevent me from appearing at the court hearing." The trial judge issued a warrant for Zachery's arrest and set bond in the amount of $5,000. The following day, appellant's counsel moved to continue the swearing of the jury and the commencement of trial until Monday, July 15. The trial court denied the motion without preju-

dice to a motion for a mistrial if efforts to obtain Zachery's presence failed. On July 17, six days after the court denied the continuance motion, appellant moved for a mistrial because both appellant and the United States marshals had been unable to locate Zachery. The trial court denied the motion on the ground that Zachery was unavailable for trial. The court also found that Zachery's testimony was available through his grand jury presentation and that, although it was "in major part" cumulative of the testimony of other defense witnesses, a transcript of his presentation could be admitted at the trial.

■ "The matter of granting a continuance is entirely within the discretion of the trial judge, but a rigid insistence by the court upon expedition of trial in the face of a justifiable request for delay can render the right to defend an empty formality." *O'Connor v. United States,* 399 A.2d 21, 28 (D.C.1979). Accordingly, a party seeking a continuance must make a showing that the continuance is " 'reasonably necessary for a just determination of the cause.' " *Id.* (quoting *Brown v. United States,* 244 A.2d 487, 490 (D.C.1968)). We have held that, at a minimum, a party seeking a continuance to obtain witnesses must show "(1) who they are, (2) what their testimony would be, (3) the relevance and competence of such testimony, (4) that the witnesses can probably be obtained if the continuance is granted, and (5) that due diligence has been used to obtain their attendance at trial." *Id.* (citations omitted).

■ Appellant argues that she met all the *O'Connor* criteria and should therefore have been granted the continuance. Although we agree that the minimal criteria were met in this case, satisfaction of the *O'Connor* criteria does not necessarily mandate a continuance. The trial court confronted a five-year-old case which, in

---

10. Appellant also argues the trial court abused its discretion in admitting into evidence Zachery's sworn grand jury testimony because he was not "unavailable" for purposes of the prior recorded testimony exception to the hearsay rule. *See Warren v. United States,* 436 A.2d 821, 825 (D.C.1981). Because appellant herself requested the admission of this evidence, she may

not now seek reversal on this ground. In any event, there was no abuse of discretion where the trial court's finding that Zachery was unavailable was not "plainly wrong or without evidence to support it." D.C.Code § 17–305 (1981); *Ready v. United States,* 445 A.2d 982, 990 (D.C.1982), *cert. denied,* 460 U.S. 1025, 103 S.Ct. 1279, 75 L.Ed.2d 498 (1983).

appellant counsel's own words, was both "horrendously, offensively old" and involved the "juggling [of] a lot of out-of-state witnesses." Under these circumstances, the trial court's decision to deny the continuance without prejudice to a motion for mistrial, enabling the trial to go forward while redoubled efforts were directed toward obtaining Zachery's appearance, was not an improper exercise of its discretion. When, almost a week later, efforts to locate the witness had still proved unsuccessful, the trial court did not err in deeming Zachery unavailable, allowing admission of Zachery's largely cumulative grand jury testimony as a substitute, and denying the mistrial motion.

### V.

 Finally, appellant argues that this case should be remanded for resentencing because the trial judge may have relied upon inappropriate considerations in the original sentencing. She argues, more specifically, that her sentence was unduly harsh because the judge improperly relied upon a 1966 grand theft conviction, may have retaliated against her for a recusal motion she had filed, and may have concluded that the "other coats" were stolen and wrongly relied upon that conclusion. This claim is frivolous. Appellant specifically admitted the 1966 conviction, and, while the record suggests that the judge was not planning to rely on the conviction in sentencing, she was legally entitled to do so. *See Grant v. United States*, 509 A.2d 1147, 1155 (D.C.1986). As to the latter two charges, appellant offers nothing but speculation to support them.

### VI.

Accordingly, we remand the record to the trial court for findings as to whether appellant's absence from court at the time the verdict was received was voluntary or involuntary. In all other respects we affirm the conviction.

*Affirmed in part and remanded.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

At 1:30 p.m. on July 18, 1985, according to her own submission, Mrs. Kimes was in Arlington, Virginia rather than in or near the courtroom, as ordered by the judge. Shortly thereafter, she was brushed by a car and hospitalized for several hours. Although the hospital records describe her as shaken but nevertheless "oriented as to month, year, name, and place," she never called the court or her attorney's office. That evening, she left the hospital and, instead of reporting to the court, flew to California without notifying any person connected with the trial of her departure. Three days later, she sent a telegram to her counsel and to the court from California disclosing her whereabouts. She was subsequently arrested on a bench warrant and on unrelated federal charges.[1]

Mrs. Kimes now claims that her conviction should be reversed because, she contends, she was denied the right to be present when the jury, which had already announced that it had reached a verdict, delivered that verdict in open court and reaffirmed it when polled by the judge. On these facts, I believe that reversal of the conviction would constitute a miscarriage of justice. Although the question of a remand is perhaps closer, for Judge Bacon never found in so many words that Mrs. Kimes' absence was voluntary, I cannot agree that there was trial court error warranting even a remand. Accordingly, I would affirm the conviction.

### I

### THE FACTS

In order to explain why I disagree with my colleagues as to the proper disposition

---

1. Mrs. Kimes had been charged in a seventeen-count indictment with holding several domestic workers in involuntary servitude. She was subsequently convicted of all of these charges and sentenced to imprisonment for five years. The conduct which led to this conviction occurred while she was awaiting trial in the present case.

of this case, I find it necessary to elaborate in some measure on the extraordinary sequence of events which has brought the issue to us. The trial was held more than four years ago, and the events which triggered it occurred five and a half years before that.

In the evening of February 4, 1980, Charles Crane, a Hewlett–Packard employee from California, made the acquaintance of Rena Cusma, a public administrator from Oregon, in the Town and Country lounge at The Mayflower. Each of these individuals had just arrived in Washington, and the two were chatting over drinks. Enjoying cocktails at another table were Robert and Katherine Kenworthy and several other people. Mrs. Kenworthy placed her dark-colored mink coat over a chair. Mrs. Kimes, who is described in the record as having some resemblance to Elizabeth Taylor, and who was wearing a white mink coat,[2] was also in the lounge. Suddenly, Mr. Crane observed Mrs. Kimes take Mrs. Kenworthy's coat from the chair, put it on, and put her own white mink coat on top of it. He nudged Ms. Cusma, who also watched the action. After completing her mink over mink maneuver, Mrs. Kimes left the lounge. She returned shortly thereafter and chatted with the Kenworthy party before departing once again.

At closing time, Mrs. Kenworthy noticed that her mink coat was missing and became understandably agitated. Mr. Crane and Ms. Cusma, who had not previously disclosed what they had seen to anyone because they could not believe that what appeared to have happened had actually taken place, reported their observations. The police were called, and the trail eventually led to the seventh floor room occupied by Mrs. Kimes and her husband. There, the police initially found no sign of the stolen mink, but did discover two other fur coats with their labels missing. Visible from the window of the Kimes' room,[3] however, on the lobby roof five floors below, was a garment which turned out to be the lining from Mrs. Kenworthy's fur coat. The coat itself was discovered some two weeks later by a hotel employee, balled up and stuffed behind an ice machine on the seventh floor. Mr. and Mrs. Kimes were arrested and charged with the theft of Mrs. Kenworthy's coat.[4]

After numerous continuances, most of them at the request of the defense,[5] the case against Mrs. Kimes came to trial on Thursday, July 11, 1985. The trial lasted a week, and it is undisputed that Mrs. Kimes attended all of the proceedings prior to the return of the jury's verdict. At the close of the first day's proceedings, and on several occasions thereafter, Judge Bacon advised Mrs. Kimes of the statutory penalties for failure to appear, and explained that "this case could go forward without your presence should you not be here or should you be late." On July 18, 1985, the judge gave her final instructions to the jurors, and they began their deliberations at 11:20 a.m. When they were excused for lunch at 12:17 p.m., Judge Bacon stated that "we would ask Mrs. Kimes to be available in the vicinity of the courtroom from and after 1:30 p.m."

At 3:55 p.m., almost two and a half hours after Mrs. Kimes was supposed to be back

2. It appears to be undisputed that Mrs. Kimes and her husband were millionaires many times over.

3. The window had been forced open and the lock broken. The police also recovered a piece of binding tape which according to expert testimony, probably came from the stolen coat.

4. After their release, Mr. and Mrs. Kimes moved to another hotel. Police searched their room at that hotel pursuant to a warrant and seized a man's jacket, which also had a missing label, from a dresser drawer. This coat apparently belonged to John E. Booth and had allegedly been stolen from a different hotel two days before the theft of Mrs. Kenworthy's coat. The

Kimes were originally indicted for stealing Mr. Booth's coat as well. Unfortunately, Mr. Booth died before the trial and the court denied a motion to admit evidence of the deceased's statements, making prosecution of this count impracticable.

5. According to one of the government pleadings, there were approximately sixteen defense requests for a continuance, and five more joint requests. At least twenty different attorneys have either appeared for Mrs. Kimes or have been noted in the file as representing her, either at trial or on appeal.

in the courtroom, and after a prior communication announcing a verdict had been retracted, the jurors sent the judge a new note stating that "we the jury have reached a verdict." Mrs. Kimes was nowhere to be found, and her counsel was unable to make any representation about her whereabouts. Denying a request by counsel to delay further proceedings until the following morning, Judge Bacon received a verdict of guilty, which was confirmed by each of the jurors during a poll. The judge excused the jurors and issued a bench warrant for Mrs. Kimes.

Three days later, as we have previously noted, Mrs. Kimes sent a telegram to her trial counsel, with a copy to the judge, revealing that she was in Garden Grove, California. She was subsequently arrested and on August 5, 1985, Judge Bacon entered an order modifying the money bond previously imposed in connection with the bench warrant and ordering that she be held without bond. In her order, the judge recited that Mrs. Kimes had been apprehended in California and that she had "failed to remain available and to appear to receive the verdict in this case and [had] taken flight across the country to her point of apprehension in California." The judge wrote that her order was without prejudice to reconsideration if counsel presented any matters establishing that Mrs. Kimes was not a threat of flight.

On September 26, 1985, new counsel for Mrs. Kimes filed a bond review motion setting forth Mrs. Kimes' version of the events of July 18, attaching thereto records from Arlington Hospital. The records disclose that Mrs. Kimes was struck or brushed by a car driven by a hit and run driver while she was crossing the street [6] in Arlington, Virginia. She was taken to Arlington Hospital, where she was oriented as to time and place but displayed anxiety and "mild confusion," with little recollection of the accident. She was admitted at 2:20 p.m., and the records relate that the acci-

dent occurred thirty-nine minutes earlier, or at 1:41 p.m. She left the hospital against medical advice later that evening and eventually returned to California. There is no allegation in the motion that Mrs. Kimes made any attempt to contact the court or her counsel at any time prior to her cross-country journey.

On October 4, 1985, Judge Bacon denied Mrs. Kimes' bond review motion, observing among other things that there was evidence of mental instability on the part of Mrs. Kimes and that she had "left Arlington Hospital against medical advice and returned to California rather than to the District of Columbia Superior Court." Mrs. Kimes was held without bond until July 24, 1986, when she was sentenced to imprisonment for three to nine years, consecutive to any other sentence.

On August 12, 1986, new counsel for Mrs. Kimes purported to file a "motion for mistrial and a new trial," claiming that Mrs. Kimes' absence from the courthouse was involuntary, and that the contrary assumption of court and counsel on July 18, 1985 had been erroneous. This motion was untimely, and the untimeliness was jurisdictional, *United States v. Lara–Hernandez*, 588 F.2d 272, 275 (9th Cir.1978); *see also United States v. Braman*, 327 A.2d 530, 534 (D.C.1974), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).[7] Presumably for this reason, Judge Bacon has never ruled on it. The evidence on which Mrs. Kimes relies, to show that her absence from court when the verdict was returned was involuntary, was thus never brought before the trial judge through a timely motion, and never expressly ruled upon by her. *Cf. Lara–Hernandez, supra,* 588 F.2d at 275.

## II

### LEGAL DISCUSSION

*A. The right and its waiver.*

Mrs. Kimes had the right to be present at every stage of her trial, and that right is

---

6. Counsel's representation in the motion, however, was that Mrs. Kimes was attempting to hail a cab to return to the courthouse.

7. A motion for a new trial which is not based on newly discovered evidence must be filed within seven days after verdict, unless the court extends the time during the seven-day period. Super.Ct.Cr.R. 33.

protected by the Constitution to the extent that a fair and just hearing would be thwarted by her absence. *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934); *State v. Rice*, 110 Wash.2d 577, 617, 757 P.2d 889, 911 (1988). More specifically, she had the right, secured by Super.Ct.Cr.R. 43(a), to be present at the return of the verdict. These rights may, of course, be waived, either by conduct, *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 253, 56 L.Ed. 500 (1912); *Cureton v. United States*, 130 U.S.App. D.C. 22, 25, 396 F.2d 671, 674 (1968); and *see* Rule 43(a), or by failure to assert them. *Frank v. Mangum*, 237 U.S. 309, 339–40, 35 S.Ct. 582, 591–92, 59 L.Ed. 969 (1915); *see also United States v. Gagnon*, 470 U.S. 522, 527–29, 105 S.Ct. 1482, 1484–86, 84 L.Ed.2d 486 (1985).

When a defendant is in custody, it is the obligation of the state to ensure his presence at all stages of the trial, and in most instances the matter is entirely outside the defendant's control. Courts rightly view with considerable skepticism claims that an incarcerated defendant has waived the right to be present at any stage of his trial, and affirmance on waiver grounds in such cases is comparatively rare. *See, e.g., Cross v. United States*, 117 U.S.App.D.C. 56, 59–60, 325 F.2d 629, 631–32 (1963); *Falk v. United States*, 15 App.D.C. 446, 457 (1899); *State v. Okumora*, 58 Haw. 425, 426, 570 P.2d 848, 851 (1977); *but cf. Rice, supra*, 110 Wash.2d at 619–21, 757 P.2d at 911–12 (suicide attempt by incarcerated capital defendant which necessitated hospitalization held to constitute voluntary waiver of presence at return of verdict).

An entirely different situation obtains, however, when the defendant is at liberty during the trial. As the Supreme Court of Pennsylvania stated in *Commonwealth v. Ashe*, 363 Pa. 596, 601, 70 A.2d 625, 628 (1950), a case heavily relied upon by the majority:

> If he is out on bail and is not present when the verdict is rendered it is taken for granted that he has waived his right to be present.

In the words of the Supreme Judicial Court of Massachusetts,

> If the commonwealth has done all that it can reasonably be required to do to secure him his rights, our statute and the common law of which it is declaratory ought not to be so construed as to prevent the return of the verdict.

*Commonwealth v. McCarthy*, 163 Mass. 458, 460, 40 N.E. 766, 767 (1895).

The reasons for treating those absent defendants who are at liberty differently from their incarcerated counterparts were well explained in *Falk v. United States, supra*. In *Falk*, a District of Columbia defendant, who had been released on bail after being charged with adultery, had failed to return to court on the second day of his trial and was convicted in his absence. After a comprehensive review of the authorities, the court concluded that the trial judge had proceeded properly in receiving the verdict in spite of Falk's absence.[8] The court further stated:

> The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries and turn them into a solemn farce, and ultimately compel society, for its own safety, to restrict the operation of the principle of personal liberty. Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong. And yet this would be precisely what it would do if it permitted an escape from prison, or an absconding from the jurisdiction while at large on bail, during the pendency of a trial before a jury, to operate as a shield from further prosecution for the crime. An escape is itself a criminal offense, although now rarely

---

8. What can be done but to call him? Is the jury to be held until he appears, and if so, how long? Not being in custody, he cannot be had.

15 App.D.C. at 456–57.

punished independently of the principal offense for which the party is held. Can it be that an act, which is in itself a criminal offense, is to be allowed in law to operate as a release from criminal prosecution, and therefore ultimately from criminal liability? We can not think that the constitutional guarantee in its practical application will lead us to any conclusion so absurd. The Constitution was not intended to shield the guilty from the consequences of crime, but to protect the innocent.

15 App.D.C. at 460–61.

Where the defendant is at liberty, a key inquiry is whether the court has taken all reasonable steps to ensure that he had the opportunity to be present. *McCarthy, supra.* The judge may, however, properly require cooperation and promptness on the part of the accused. In *Clemens v. State,* 176 Wis. 289, 185 N.W. 209 (1921), the trial judge advised the defendant and his counsel that, if the jury reported agreement before 9 or 10 o'clock in the evening, he would receive the verdict. The defendant and his counsel were to be available at the latter's office nearby. At 8:45 p.m., the jury announced that it had reached its verdict and the office of defense counsel was immediately notified by telephone. The judge waited for about fifteen minutes and then received the verdict outside the presence of the accused and his counsel. The Supreme Court of Wisconsin affirmed the conviction, observing that "it would be unfair, under the circumstances, to expect the court to wait an unreasonable length of time." *Id.* at 314, 185 N.W. at 217. *See also United States v. Friedman,* 593 F.2d 109, 121 (9th Cir.1979) (defendant disregarded trial judge's instruction to remain near enough to court to be able to return within fifteen minutes of notice of return of jury; conviction sustained though verdict was taken in absence of the defendant and his counsel); *People v. Malloy,* 41 Cal. App.3d 944, 954, 116 Cal.Rptr. 592, 598 (1974) (verdict properly received in defendant's absence where he was excused to go to cafeteria during deliberations and did not return, after series of phone calls failed to disclose defendant's whereabouts); *Stoddard v. State,* 132 Wis. 520, 112 N.W. 453 (1907) (conviction sustained where bell was rung to notify defendant that jury had reached a verdict and court waited thirty minutes before receiving it without defendant being present);[9] Annotation, *Absence of accused at return of verdict in felony case,* 23 A.L.R.2d 456, 478–90 (1952), hereinafter *Absence of accused,* and authorities there cited.

These decisions do not mean, of course, that a defendant who is free on bail and who, through no fault of his own, is unable to be present during his trial, automatically forfeits rights secured by the Constitution or by Rule 43. *Cureton, supra,* 130 U.S. App.D.C. at 25–27, 396 F.2d at 674–76. Release on bail however, surely obliges a defendant, at least, to undertake best efforts to be punctual in attendance and to comply with the directions of the court. *See United States v. Clemons,* 676 F.2d 124, 126 (5th Cir.1982); *People v. Litteral,* 75 Mich. App. 38, 43, 254 N.W.2d 643, 646 (1977). Given the finding of a waiver in *Rice, supra,* in which a capital defendant was in custody, I am of the opinion that where the defendant's absence results directly from an unlawful act on the defendant's part, this constitutes a waiver of the right to be present.

---

9. In *Stoddard,* the court stated:

In this case the facts show that plaintiff in error voluntarily absented himself from the courtroom and its immediate vicinity, in such manner that he did not hear the usual call by bell announcing that the jury had agreed upon a verdict. The court's officers, after a reasonable search, were not able to find him to inform him that the jury were prepared to report the verdict they had agreed upon. In effect, this conduct is a waiver of his right to be present, if he can in law so waive it. The decisions are not uniform upon the question of his power to so waive it.

\* \* \* \* \* \*

The defendant was not imprisoned, nor was he prevented by any improper means from being present when the verdict was rendered. He voluntarily and wrongfully absented himself, and he cannot now claim any advantage on account of such absence. (Citation omitted.)

132 Wis. at 526, 112 N.W. at 455.

### B. The degree of prejudice.

The amount of prejudice, if any, which a defendant has suffered as a result of not being present at some part of the trial depends substantially on the particular stage of the proceedings which he or she has missed. Where the defendant was absent from all that occurred following jury selection, as in *Cureton, supra,* the prejudice was obviously substantial. In *Winestock v. United States,* 429 A.2d 519 (D.C. 1981), on the other hand, the defendant and his counsel had not been notified of a jury note and were not present when the trial judge responded to it. We held in *Winestock* that although the judge had improperly impaired the defendant's right to be present throughout the proceedings, the error was harmless beyond a reasonable doubt. *Id.* at 528–30. More recently, in *Kentucky v. Stincer,* 482 U.S. 730, 747, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987), the Supreme Court sustained the sodomy conviction of a defendant who had been excluded from the competency hearing of the children who were his accusers, noting that there was no evidence that Stincer could have done anything useful to his defense at the hearing or gained anything by attending. The prejudice to a defendant seems to me to be significantly less than it was in *Winestock* and in *Stincer* where, as here, the jurors had already decided upon a verdict and the defendant, who had participated in all prior proceedings, was absent only from the return of the verdict and the poll that followed it.

My colleagues think it critically important that the jurors be in the presence of the accused when they report a verdict on which they have previously agreed. There is some case support for this theory, which is apparently predicated on the perceived psychological influence on the jurors of possible eye contact between them and the accused. Hundreds of jury trials in the Superior Court, however, have not made me an adherent of this hypothesis, and there is persuasive case support for my empirical skepticism.

Almost a century ago, in *Commonwealth v. McCarthy, supra,* the Supreme Judicial Court of Massachusetts had this to . say about the importance or lack thereof of the defendant's presence at this last chapter of the proceedings against him:

> This final act of the jury is nothing more than a formal announcement of the result of a trial which up to that point has proceeded with unquestionable regularity. There is no very important reason for requiring the defendant's presence then. It is well that he should be there, ready to receive the sentence of the court, but the possibility of his absence is a risk to the commonwealth, which necessarily results from his admission to bail.

> \* \* \* \* \* \*

> The suggestion that the jurors should be required to look upon him, when about to return their verdict, with the possibility that they may see something in his appearance that time which will affect them in the performance of their duty, is not founded upon any important principle of law or good reason in the practical administration of justice.

163 Mass. at 460–61, 40 N.E. at 767.[10] *Accord, Rice, supra,* 110 Wash.2d at 615, 757 P.2d at 910 (jurors individually polled; court observed that "there is nothing in the record which indicates that the result would have been any different had Rice been present"); *Friedman, supra,* 593 F.2d at 121 (multi-defendant case in which defendant was absent when jury returned verdict; court held that he had not shown that he suffered prejudice from his absence from this portion of the trial, and that any error was harmless beyond a reasonable doubt); *Foster v. State,* 722 P.2d 714, 716 (Okl.Crim.1986) (defendant taken ill and absent when judge received "second stage" verdict; "although the trial court erred in proceeding in this manner, it is difficult, if not impossible, to imagine how this appellant was prejudiced").

---

**10.** Although he was not the writer of the opinion, one of the members of the court who joined in it was Justice Oliver Wendell Holmes.

"When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [and women]." *Edwards v. Habib,* 130 U.S.App.D.C. 126, 140, 397 F.2d 687, 701 (1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969). In my career on the bench, or at the bar, I have never seen a case in which a juror permanently [11] withdrew his or her assent to a reported verdict after beholding the defendant one last time. I am sure there must have been such cases, but I have never even heard of one. Although I acknowledge that my own anecdotal experience is not statistically conclusive, it is surely incompatible with the theory that there is any appreciable possibility that looking at a defendant once again after the verdict had been reached would change a juror's vote. Moreover, the cases cited suggest that my experience is not atypical. I conclude that, at least on facts such as these,[12] the possibility of prejudice is extremely remote.

## C. Preservation of the right.

In *Cureton, supra,* in which the defendant was absent for almost all of his trial, the court remanded for further proceedings, and explained that

It would go a long way to avoid uncertainty in such cases were the trial court at the time of sentencing to explore the reason the defendant was absent. As we have seen, Rule 43 permits a trial which has commenced in defendant's presence to be continued in the event of his voluntary absence "to and including the return of the verdict." The defendant must be present at his sentencing. An opportunity could then be afforded the defendant to make any explanation he may have for his absence and also for development on the record of a basis upon which to determine whether, consistently with Rule 43

as we have interpreted it, the court properly continued with the trial in the defendant's absence.

130 U.S.App.D.C. at 27, 396 F.2d at 676. *See also United States v. Muzevsky,* 760 F.2d 83, 85 (4th Cir.1985), in which the court affirmed a conviction where the defendant had been absent from his entire trial, but suggested that judges revisit the issue of voluntariness in such cases when deciding a motion for a new trial or at sentencing. Neither *Cureton* nor *Muzevsky,* nor any case cited by the majority, expressly decides whether the court has the obligation to make such an inquiry *sua sponte,* or whether the defendant is expected to initiate it.

"It has been held or recognized that where the defendant fails to make his absence at the rendition of the verdict in a felony case ... a ground for a new trial in the lower court, he cannot in the appellate court complain that he was deprived of his right to be present...." *Absence of accused, supra,* 23 A.L.R.2d at 477, and *see* authorities there cited. In *Frank v. Mangum, supra,* the defendant had failed to include among the numerous grounds for his motion for a new trial his contention that he was denied the right to be present when the verdict against him was returned. The Supreme Court held that the courts of Georgia could properly find that the point was waived. 237 U.S. at 338–40, 35 S.Ct. at 591–92. *Accord, Cassius v. State,* 110 Tex.Crim. 456, 459, 7 S.W.2d 530, 532 (1928); *Boreing v. Beard,* 226 Ky. 47, ——, 10 S.W.2d 447, 451 (1928); *Coates v. Lawrence,* 46 F.Supp. 414, 422 (S.D.Ga.), *aff'd,* 131 F.2d 110 (5th Cir.1942), *cert. denied,* 318 U.S. 759, 63 S.Ct. 532, 87 L.Ed. 1132 (1943). *See also Gagnon, supra,* 470 U.S. at 527–28, 105 S.Ct. at 1484–85 (defendant's right to be present at judge's *in camera* meeting with juror waived by non-assertion).

**11.** I recall a single case in which, in a poll of the jurors, Nos. 1 through 3 voted guilty and No. 4 voted not guilty. A verdict of guilty had been checked on the verdict form. The jurors were directed to continue their deliberations, reported agreement again some time later, and all twelve confirmed the guilty verdict during the second poll.

**12.** This is not a case in which the evidence was only marginally sufficient, or where a defendant was incarcerated and the government willfully or recklessly failed to bring him to court. The latter kind of situation raises the question, not present here, whether reversal would be appropriate as a prophylactic measure to discourage wrongful conduct by the government.

It is undoubtedly appropriate for a trial judge, *sua sponte*, to make the kind of inquiry contemplated in *Cureton* and *Muzevsky* before sentencing, particularly where the defendant has been absent from an important part of his trial. In light of *Frank* and similar cases, however, I conclude that it is incumbent upon the defendant to raise the issue in timely fashion in the trial court, and that the judge's failure to do so on his or her own initiative following the defendant's apprehension is not error in the absence of manifest injustice.

## D. The principles applied.

Applying the foregoing considerations to the facts at bar, I conclude that neither reversal nor remand would be appropriate, for Judge Bacon did not commit error in relation to the issue presented or otherwise.

In my view, the judge had the right and obligation to receive the verdict when Mrs. Kimes was absent nearly two and a half hours after she had been directed to return to court. *See* authorities cited at p. 119 of this opinion. Mrs. Kimes had been explicitly warned that if she failed to appear, or if she was late, the proceedings would continue without her. Her absence itself, under these circumstances, created at least a strong inference that it was willful. *Raymond v. United States*, 396 A.2d 975, 977 (D.C.1979). Her failure to notify counsel or the court regarding her whereabouts further reinforced that inference. *United States v. Ott*, 741 F.2d 226, 228 (8th Cir. 1984). To suggest that Judge Bacon should have deferred accepting a verdict upon which the jurors had already agreed, where the defendant had already been absent so long, appears to me altogether unreasonable. If judges warn defendants of consequences and these consequences are not imposed, warnings will not be heeded, to the prejudice of the entire judicial process. If a juror had become ill overnight, for example, the entire trial might well have had to be abandoned.

In *United States v. Raper*, 219 U.S.App. D.C. 243, 248, 676 F.2d 841, 846 (1982), in which one of the defendants was some forty minutes late when the trial judge resumed the trial without him, the court affirmed his conviction in spite of the fact that this defendant missed some of the testimony. The court held that the late defendant's interest in the postponement of the trial or in a severance was outweighed by "the burdens that such action would impose on the court, the government, the witnesses, the codefendant, and the public." With the exception that there was no codefendant, the same considerations apply here, and we must add the jurors, some of whom had completed their terms of service, to the list of persons who would be inconvenienced or worse if the court could not proceed here in Mrs. Kimes' absence.

Moreover, Mrs. Kimes' counsel requested a delay until the following morning. Mrs. Kimes' own submission reveals that, if that request had been granted, she still would not have been available, nor would counsel have known where to find her. Even if the judge's refusal to defer taking the verdict until the next morning had been error—and it was not—such error would have been demonstrably harmless.[13]

---

**13.** My colleagues say that Judge Bacon erred "in failing to conduct an on the record inquiry into the circumstances surrounding appellant's absence," and in making appropriate findings. I read the record differently.

Defense counsel advised the court during the afternoon of the day on which the verdict was taken that he was unable to locate Mrs. Kimes. He stated that he had explained to his client that she had the responsibility to be available for the verdict. The judge asked counsel to try to locate his client, and counsel agreed. About an hour later, following a recess, counsel represented to the court that a colleague had been making "fairly continuous" efforts to locate Mrs. Kimes, but had been unsuccessful. Under these circumstances, I do not see what else the judge could have done, or what additional inquiry she could have undertaken. Although Judge Bacon made no explicit finding that Mrs. Kimes' absence was voluntary, there was simply no evidence available to suggest otherwise. *See Robinson v. United States*, 322 A.2d 271, 273 (D.C.1974) (failure to appear after notice of appearance date is *prima facie* evidence of willfulness); D.C.Code § 23–1327(b) (1989).

I also conclude that Judge Bacon had no obligation, at sentencing or at any other time after Mrs. Kimes' apprehension, to make an inquiry, *sua sponte*, into the question whether Mrs. Kimes' absence from the taking of the verdict was voluntary. This case is not like *Cureton* or *Muzevsky*, in which the defendants were absent from most or all of their trials. Although Mrs. Kimes' attorneys presented her medical records and other materials bearing on the issue of voluntariness, the only relief which they requested in that connection was a modification of Mrs. Kimes' bond. I suggest that it is unreasonable to expect the judge to read the minds of competent counsel, or to supplant them, and to consider or grant relief which has not been requested. Not a word was said by defense counsel at sentencing to suggest that the issue of involuntary absence was being raised, and the motion for a new trial came far too late.[14]

Even if I were willing to assume—which I am not—that a specific finding by the trial judge as to voluntariness was required without an appropriate request from counsel, and that it was error to sentence Mrs. Kimes in the absence of one, I am satisfied that any such error would have been harmless. *See Commonwealth v. McCarthy*, *supra*, and the authorities cited at pp. 120–121 of this dissent. The evidence against Mrs. Kimes was compelling. Her trial was fair. She was present during every stage of the proceedings at which anything was contested. There is not the slightest indi-cation that the verdict would have been different if she had been present when it was returned, and her absence was, at the very least, partially her own fault.

Where the state has done wrong, convictions of guilty persons must sometimes be reversed in order to deter those acting under color of law from denying citizens their constitutional rights. In my opinion, this is not such a case. The central purpose of a criminal trial is to decide the question of guilt or innocence, and appellate reversal of a conviction for an error, real or perceived, which has played no role in bringing about the judgment "encourages litigants to abuse the judicial process and bestirs the public to ridicule it." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). This is particularly true where, as here, a defendant is complaining of circumstances which would never have existed if she had complied with the order of the court. It is the combination of factors here—the powerful evidence of guilt, Mrs. Kimes' disregard of a court order, her failure to contact the court after the accident, her subsequent flight, the lack of any meaningful role for her in the proceeding which she did not attend, the improbability of actual prejudice, and the steep price that would have to be paid by innocent people for a reversal following a lengthy trial with numerous out-of-town witnesses—that seems to me to militate so strongly in the government's favor.

Mrs. Kimes had a fair trial. She was not entitled to a perfect one. *Rose v. Clark*,

---

**14.** We know from Mrs. Kimes' own submission that she was in Virginia when she was supposed to be in or near the courtroom. She had no way of knowing whether the verdict would be returned at 1:30 or immediately thereafter, and her failure to return to the courtroom at the time she was directed to do so demonstrated obvious disregard of her responsibility to the court. Moreover, her own documents show that she left for California without returning to court, and apparently without any inquiry as to the status of her case. Obviously, on her own version of events, Mrs. Kimes did far less than she could have done to assure that she would be present in court whenever the verdict might be returned. *See Clemons, supra,* 676 F.2d at 126.

Judge Bacon's orders in relation to Mrs. Kimes' bond came close to a finding that her absence was voluntary. It seems improbable, to say the least, that the judge would have found the contrary if Mrs. Kimes had raised the issue appropriately and in timely fashion in the trial court. This should foreclose her from advancing it on appeal.

The judge's recognition that Mrs. Kimes' erratic conduct bespoke possible mental instability "which impairs compliance with court orders" does not, in my view, detract from that conclusion. Absent a claim of insanity or incompetence, Mrs. Kimes' obvious mental problems do not bear on the question of voluntariness.

478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). I would affirm her conviction.[15]

---

**15.** I agree with the majority that Mrs. Kimes' other claims of error are unpersuasive.